Jeanette PARKER, as Next Friend of Larry Fann, N.C.M. and as Legal Guardian of the Person and the Estate of Larry Fann, Appellant,

v.

Gary E. MILLER, M.D., Commissioner, Department of the Mental Health and Mental Retardation, Jimmy R. Haskins, Superintendent, Brenham State School; Rex Fuller, M.D., Physician, Brenham State School; John Sessums, M.D., Physician, Brenham State School; Glen Davis, M.D., Physician, Brenham State School; Dorothy Antkowiak, Supervisor, Brenham State School, Brenda Hrnicko, Supervisor, Brenham State School; Georgia Daniels, Acting Dorm Charge, Brenham State School; Geraldine Weigelt, Assistant, Brenham State School; Deborah Genz, Assistant, Brenham State School; Calvin Hubert, Assistant, Brenham State School; Joyce Sontag, Assistant, Brenham State School; in their individual Capacity and Official Capacity; Brenham State School; and the Texas Department of Mental Health and Mental Retardation, Appellees.

No. 01–92–00052–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 29, 1993.

Rehearing Denied Sept. 16, 1993.

Neal H. Paster, James F. Tyson, Neal H. Paster & Associates, Houston, for appellant.

Norberto Flores, Austin, for appellees.

Before OLIVER–PARROT, C.J., and COHEN and MIRABAL, JJ.

## OPINION

OLIVER–PARROTT, Chief Justice.

This is an appeal in a personal injury suit. The jury found appellees not liable for the injuries to Larry Fann, the real party in interest. Based on the jury findings, the trial court awarded a take-nothing judgment to Fann. We affirm.

On August 29, 1985, Fann, was injured while a client of the Brenham State School (the School). He was assaulted by Charles Williams, another client who had a history of violent behavior against persons and property. In the 10 years preceding the attack, Williams committed at least 68 acts of aggression and 17 acts of destruction against School staff and clients. Both clients are mentally retarded.

Both Williams and Fann resided in Dorm A of the School's Childress Unit. The School superintendent, Jimmy Haskins, and the Unit director, Joseph Melhop, were aware of Williams' violent behavioral history. Williams had a Behavioral Management Program (the Program), specifically designed to respond to his violent behavior. The Program was created, administered, and modified by the School's inter-disciplinary team, a group made up of various school employees and agents.

Williams, who usually was friendly and sociable, would change his facial expression or get a glazed look in his eyes immediately prior to one of his violent outbursts. All Unit staff were familiar with Williams' program, which contained a series of steps designed to defuse Williams once the "look" was detected, including the authorization for use of physical restraints if believed to be necessary to protect staff and other clients.

Unit staff were also very familiar with the behavior of Fann. The staff knew of Fann's strong craving for cigarettes and his overall reluctance to obey instructions, especially if cigarettes were involved.

On August 8, 1985, three weeks prior to the incident in question, at Williams' annual staff evaluation, the Unit psychologist recommended and approved that wrist and ankle restraints be added to Williams' Program, that one-to-one monitoring of Williams be employed, and further recommended that Williams be transferred, for the safety and welfare of the staff and clients, to another facility where he would live in a more restrictive environment.

On August 29, 1985, as the clients were dressing for breakfast, Fann informed staff member Calvin Hubert that he believed that another client, Burt Watson, had stolen and hidden his cigarettes. Hubert told Fann that later on he would look for the cigarettes.

The Unit staff observed that morning that Williams was exhibiting the "look" and all five Unit staff on duty were notified of his condition. Georgia Daniels, the immediate supervisor instructed the four other staff

members to segregate Williams in his bedroom and to gather all the other clients into the front dayroom. Staff member Geraldine Weigelt was instructed to monitor Williams one-to-one in the back bedroom. Hubert was to monitor the other 24 clients in the front dayroom. Staff member Joyce Sontag left Dorm A to wrap silverware in the kitchen, and staff member Deborah Genz left the immediate area to clean the staff restroom facilities. Daniels returned to her office.

Weigelt, who had on previous occasions been attacked by Williams, entered the backroom and was grabbed on the arm by Williams. After verbal persuasion, Williams released her, and she immediately went to Daniel's office to get help. During this period of time Fann went into the back bedroom to search for his cigarettes and was attacked by Williams, who beat and stomped Fann into unconsciousness. Fann remained unconscious for two weeks and suffered permanent injury to his balance and motion skills.

### First and second points of error

In the first and second points of error, appellant contends that the trial court erred in entering a take-nothing judgment on her negligence claims against the School and the individual appellees because the evidence was factually insufficient to support the jury's findings on question nos. one and two.[1]

■ To sustain a cause of action for negligence, it is necessary to produce evidence of a duty, a breach of that duty, proximate cause, and damage. *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex.1984); *Fort Worth & Denver City Ry. v. Rogers*, 62 S.W.2d 151, 153 (Tex.Civ.App.—El Paso 1933, writ ref'd).

■ In our review of appellant's "insufficient evidence" point, we must consider and weigh all the evidence in the case, including that which is contrary to the verdict. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex. 1980); *M.J. Sheridan & Son v. Seminole Pipeline*, 731 S.W.2d 620, 623 (Tex.App.— Houston [1st Dist.] 1987, no writ). We must determine whether the verdict was so against the great weight and preponderance of the evidence as to be manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In other words, this Court must decide if the

1. QUESTION NO. 1
Was Brenham State School, by and through its agents or employees, negligent in the use or nonuse of available physical restraints, isolation rooms, or the securing of doors on the premises of the school which negligence proximately caused injury to Larry Fann?
Answer Yes or No.
ANSWER: NO
QUESTION NO. 2
Did the negligence of any of the persons listed below in the performance of a ministerial act or a discretionary act proximately cause injury to Larry Fann?
A 'ministerial act' means that an action requires only obedience to orders or performance of a duty as to which a person is left without choice.
A 'discretionary act' means that it is an act of a state employee or official exercising his or her own judgment.
With respect to a discretionary act, if you find that a person named below was not negligent, or that a person was negligent and that the

negligent act or omission occurred in the performance of a discretionary act within the course and scope of that person's job duties and that the negligent act or omission was done in good faith, then you are instructed to answer the discretionary act portion of this question 'no' as to such person.
With respect to a discretionary act, if you find that a person named below was negligent in the performance of a discretionary act and that such negligence was not performed within the course and scope of that person's job duties or that such negligence was not done in good faith, then you are instructed to answer the discretionary act portion of this question 'Yes' as to such person.
'Good faith' means that the government official performing a discretionary function in the course and scope of his job duties has not acted or failed to act in violation of clearly established statutory or constitutional rights of which a reasonable person would have known.
Answer 'Yes' or 'No' as to each.

|  | Ministerial | Discretionary |
| --- | --- | --- |
| (a) JIMMY R. HASKINS | NO | NO |
| (b) DOROTHY ANTKOWIAK | NO | NO |
| (c) BRENDA HRNICKO | NO | NO |
| (d) GEORGIA DANIELS | NO | NO |
| (e) DEBORAH GENZ | NO | NO |
| (f) JOYCE SONTAG | NO | NO |
| (g) CALVIN HUBERT | NO | NO |
| (h) GERALDINE WEIGELT | NO | NO |

evidence that supports the jury's answers to the questions is so weak, or the evidence to the contrary is overwhelming, as to warrant setting aside of the verdict and remanding for a new trial. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ The School is a division of the Texas Department of Health and Mental Retardation (MHMR) and operates in accordance with the MHMR Administrative Code (the Code).[2] The pertinent portions of the Code that guide the conduct of the appellees are summarized as follows:

§ 405.841—defines the purpose of Subchapter HH to establish procedures prohibiting use of restraint or seclusion in mental retardation facilities except as an emergency measure to protect against injury or as part of a behavior therapy plan, all subject to specific exceptions.

§ 405.842—provides that this subchapter of the Code applies to all MHMR mental retardation facilities and permits facility superintendents to further restrict use of restraint and seclusion so long as such restrictions were not in conflict with the Code.

§ 405.843—defines mechanical restraint as any physical device designed to control body movement, defines seclusion as confinement in a locked room or other area from which egress is prevented; and defines contingent restraint and locked timeout as use of restraint and seclusion, respectively, in conjunction with behavior therapy procedures.

§ 405.844—permits use of restraint or seclusion only when absolutely necessary to prevent harm.

§ 405.845—permits use of restraint or seclusion if as a part of a behavior therapy program, so long as the program contained a physician's statement that there were no medical contraindications to such a program. The section also permits emergency use of restraint (for short duration) without necessity of a physicians' order.

§ 405.846—authorized use of restraint or seclusion without physician's order in an emergency in which there is imminent probability of harm to the client or others. 25 TEX.ADMIN.CODE § 405.841–.846 (West 1987).

The School also maintained written policies and procedures, intended to provide for the protection of the clients and staff. These rules are as follows:

(1) Client Rights—School staff shall provide clients with a safe, humane living environment.

(2) Behavior Management refers to one-to-one staff assignment when required by a client's behavior. The minimum degree of supervision when one-to-one has been assigned is to have the client within arm's reach and in visual contact at all times.

(3) *Behavior Management permits use of restraints only when less restrictive means have failed.* Restraints are authorized in situations where a client is exhibiting destructive behavior to such degree that he is in danger of injury to himself or others.

(4) Behavior Management provides that if client is displaying aggression or destruction which threatens others and less restrictive means have failed, staff will immediately notify the Unit supervisor. If the client has a restraint program staff may immediately place client in restraint. If an emergency exists, a supervisor's approval of the initiation of restraint was required.

(5) Behavior Management authorized use of restraint only upon written physician's order.

The only distinction between the School's policies and the procedures established by the Code is that during an emergency situation, the School is required to notify a supervisor before using employment of the restraint, unless a restraint program existed for the client.

Due to his frequent behavior crises and violent behavior, Williams had a Behavior Management Program that went into effect on March 1, 1984, approximately 18 months prior to the date of injury. The program called for (1) observation of Williams, (2) his separation from other clients, (3) verbal re-

2. 25 TEX.ADMIN.CODE § 405.840 (West 1987).

direction of anger, and (4) in an emergency, restraint upon permission of professionals.

On August 8, 1985, at Williams' annual staff review, William Grant, Childress Unit psychologist made the following observations:

(1) Williams had recently been placed on one-to-one monitoring at all times while on the Unit due to his behavioral problems;

(2) the intensity of his behavioral crises had increased to the point that his assault of other clients were of a very serious nature;

(3) Williams had required emergency use of restraints for some intensive episodes of assault; and

(4) Williams will stomp clients on the head causing serious damage.

Grant made the following recommendations:

(1) addition of wrist and ankle restraints to Williams' program;

(2) placement of Williams on one-to-one monitoring indefinitely; and

(3) transfer to a more restrictive environment because his attacks required closer supervision than that available at the School.

The staff rejected the transfer recommendation, but approved recommendations one and two. The record shows on August 19, 1985, Dr. Rex G. Fuller included in Williams' file a letter reading "I have reviewed [Williams'] behavior program and I see no medical contradictions to the use of restraint as specified in the program." Grant's one-to-one supervision was also in effect.

On the day of the incident, when it was determined that Williams was a potential behavior problem, the staff were instructed to observe him. As part of his program, Williams was segregated from the other clients and on one-to-one monitoring with Weigelt. As Weigelt was watching him in the backroom, he grabbed her and she went to find help. There was no policy against her conduct. During Weigelt's brief absence, Fann was able to get into the backroom and was attacked by Williams.

Daniels testified that on the date of injury, Daniels, Sontag, Genz, Hubert, and Weigelt were on duty in Dorm A. Further, she assigned Genz and Hubert to clients in the front dayroom and Sontag and Weigelt were assigned to clients in the back dayroom. At the time of the injury, Sontag had left to go to the dining room to wrap silverware, and Genz was in the staff restroom in the back of her office, with Daniels' knowledge and approval.

Haskins, the School superintendent, testified that failure to supervise Williams while in a one-to-one supervision would be a breach of his program. He also stated that if their safety was threatened, School staff had the power to deviate from the program. On September 4, 1985, Ellen Wiese, Unit social worker, wrote a report reviewing the events of August 29 and concluded, "[t]here did not appear to be any neglect on the part of the staff on [sic] their attentiveness to the Dorm A clients." Moreover, Haskins agreed with Wiese's conclusion that there had been no staff neglect in this instance. He also testified that there had been no violation of the Code. Brenda Kaye Hrnicko believed she complied with the treatment program objectives for both Fann and Williams.

There was only one exception to this consistent pattern. Joe Melhop, Unit director, testified that he thought Weigelt violated school policy in leaving Williams by himself. Weigelt, however, testified that "she knew she could not control Williams." Haskins testified that there was no policy preventing a staff member from seeking and receiving help if they thought they needed it.

Appellant cites *Robinson v. Central Texas MHMR Center,* 780 S.W.2d 169 (Tex.1989), for the proposition that appellees' failure to use restraint on Williams establishes as a matter of law a violation of duty to Fann. We disagree. There was testimony from Daniels and Genz that they believed they needed approval to use restraints in an emergency situation, even though there had been a letter placed in Williams' file allowing such measures.

The School's policy was that an emergency did not arise just because Williams had the "look," but when there was a physical action on his part. Haskin testified as follows:

Q. How far does the client have to go before they would be physically restrained in the restraint room? Do they have to attack somebody or take a swing at somebody like that?

A. Yes. They would have to attack somebody.

. . . .

Q. And no matter how dangerous someone was, you should not restrain them in any manner with any type of restraints or put them into a seclusion room until they had actually physically attacked someone, according to your interpretation or rules you were to enforce; is that correct?

A. Need to be some evidence that the person either had done that or was about to do that. Some overt action on the part of the individual.

Question one to the jury only inquired about restraints, isolation rooms, and the securing of doors. There was no mention of failure to transfer or constantly monitor.

In reviewing the questions and the evidence, we find that the evidence is sufficient to support the jury's findings, and such findings were not against the overwhelming weight and preponderance of the evidence. *See Colvin,* 682 S.W.2d at 245.

We overrule the first and second points of error.

**Third point of error**

In her third point of error, appellant contends that the trial court erred in entering a take-nothing judgment on appellant's civil rights claim because the evidence is factually insufficient to support the jury's finding on question no. four.[3]

Appellant claims violations of Fann's right "to be free from violent assault and to live in a safe environment as a ward of the State." U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19; TEX.HEALTH & SAFETY CODE ANN. § 592.037 (Vernon 1991) (the Mentally Retarded Persons Act). Appellant claims that 42 U.S.C.A. § 1983 (West 1986) (Civil Rights Act), acts as a conduit to access her constitutional rights.

To determine whether a person has been deprived of constitutional rights under section 1983, the courts looks at whether there has been a deprivation of a protected interest. *See Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). The Supreme Court has acknowledged that the right to personal security is a "historic liberty interest" protected by the substantive due process clause of the fourteenth amendment. *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). This right to personal security continues during involuntary commitment to a mental institution. *Id.* at 315, 102 S.Ct. at 2458. The only question, then, is whether any appellees improperly engaged in conduct that deprived Fann of these rights.

The record reflects that the School and its staff, had in place the Program for dealing with Williams' behavior problems as a result of previous incidents. The staff was aware of the Program developed by the inter-disciplinary team, and the staff followed the Program on the date of the incident.

We conclude the evidence is factually sufficient to support the jury's finding that the individual defendants did not act "intentional-

3. QUESTION NO. 4
Did any of the following persons violate Larry Fann's civil rights?
You are instructed that a violation of Larry Fann's civil rights may only be found if the act or omission was done or failed to be done under the color of State or Federal law, intentionally, willfully, or in gross indifference to or in wanton disregard of the rights of Larry Fann to be provided with a reasonably safe environment, proper supervision and care, and reasonable protection from violence and assault.
Consider each person individually, and a violation of civil rights does not occur unless the individual had a direct, personal involvement in causing plaintiff's injuries, or that person knowingly and intentionally participated in someone else's wrongful conduct.

Answer 'Yes' or 'No' as to each.

| | | |
|---|---|---|
| (a) | JIMMY R. HASKINS | NO |
| (b) | DOROTHY ANTKOWIAK | NO |
| (c) | BRENDA HRNICKO | NO |
| (d) | GEORGIA DANIELS . | NO |
| (e) | DEBORAH GENZ | NO |
| (f) | JOYCE SONTAG | NO |
| (g) | CALVIN HUBERT | NO |
| (h) | GERALDINE WEIGELT | NO |

ly, willfully, or in gross indifference to or in wanton disregard of the rights of Fann."

We overrule the third point of error.

**Fourth point of error**

In her fourth point of error, appellant contends that the trial court erred in its denial of her motion for new trial because the jury's findings on question nos. two and four were against the greater weight and preponderance of the evidence.

A trial court has wide discretion in denying a motion for new trial, and its action will not be disturbed on appeal absent a showing of an abuse of discretion. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex. 1983). We have already concluded that the evidence is factually sufficient to support the jury's answers to questions two and four. Therefore, the trial court did not err in denying a new trial. *Id.*

We overrule the fourth point of error.

**Fifth and Sixth Points of Error**

In her fifth and sixth points of error, appellant contends the trial court erred in excluding a summary of Williams' prior assaultive conduct record from evidence.

The excluded summary was a summary of records that were in evidence already. The evidence, therefore, was cumulative and the judge had the discretion to exclude it. *Ahlschlager v. Remington Arms Co.*, 750 S.W.2d 832 (Tex.App.—Houston [1st Dist.] 1988, writ denied); TEX.R.CIV.EVID. 403.

We overrule the fifth and sixth points of error.

We affirm the judgment of the trial court.