Joel **LUTHER** and Danny Prestridge, Appellants,

v.

**TEXAS PARKS AND WILDLIFE DEPARTMENT, Appellee.**

No. 07–93–0033–CV.

Court of Appeals of Texas, Amarillo.

Oct. 25, 1993.

Conant Whittenburg Whittenburg & Schachter PC, Charles G. White, Susana Watkins, Amarillo, for appellants.

Atty. Gen., Peter B. Plotts, III, Austin, for appellee.

Before DODSON, BOYD and POFF, JJ.

POFF, Justice.

Appellants Joel Luther and Danny Prestridge were injured when the air mattress on which they were floating was hit by a speedboat on Lake MacKenzie. Appellants sued the driver of the boat, the MacKenzie Municipal Water Authority (MacKenzie), and the Texas Parks and Wildlife Department (TPWD). Summary judgment was granted in favor of TPWD and the cause of action against TPWD was severed. By three points of error, appellants appeal the trial court's order of summary judgment in favor of TPWD.

A brief review of the facts is necessary. All of the facts are gleaned from deposition testimony. On Sunday, June 23, 1991, Luther, Prestridge, two friends, and a child of one of the friends journeyed from Amarillo to Lake MacKenzie in Briscoe County for a day of swimming and relaxation. The adults each paid two dollars to enter the lake premises. The small group then proceeded to the beach area where they all entered the water and began to swim. No lifeguards manned the beach and no ropes or buoys marked off a swimming area. The only signs posted by MacKenzie at the lake regarding swimming were signs warning boaters to stay clear of swimmers. Ten or fifteen other people were already swimming and more people were on the beach. Two or three boats came into the beach at low speeds to let people out of the boats.

After inflating an air mattress, Luther and Prestridge floated out into the lake on the mattress. The pair drifted somewhere between 40 and 70 yards away from the shore, farther out into the lake than any other swimmers. While floating in the lake, Luther and Prestridge were approached by a motor boat carrying two uniformed Texas Parks and Wildlife Department game wardens, Julius Stevens and Trent Anderson.

Luther described the meeting in the lake as follows:

Well, they pulled up beside us. And as Danny said, we both got ahold of the side of the boat, and there was an older gentleman wearing kind of a straw cowboy hat, and he was the one driving and doing the talking. And he looked down, you know, and he was talking to us, and he goes, well, I don't—he goes, you boys probably need to go—turn around and start heading back the other way, because if you do get any further out, then accidents do happen, and you could get hit by a boat.

And I said, yes, sir, and Danny said, yes, sir. .

And he said, okay.

And then like Danny said, the other park ranger, he was a younger guy—younger, I mean, he wasn't real young, and he was—he was pretty stocky, had dark sunglasses on, and he was just pointing towards the shore. You know, like Danny said, just motioning towards the shore; he didn't say nothing. He just kind of sat there and motioned to kind of go back in the other way.

According to Prestridge, the game warden driving the boat said, "y'all ain't doing nothing wrong, but we wish you would move on in a little farther, closer to the shore, because we've seen accidents happen ... that boats ran over you."

Trent Anderson testified that while he and Julius Stevens were patrolling the lake, they saw two people on an air mattress. The game wardens decided to go and "check it out." Once the wardens reached Luther and

Prestridge, Anderson asked the boys how old they were. The boys responded that they were 18 and 19 years old. Then Anderson said, "would y'all consider moving in closer to the bank." The boys said "no problem." Anderson did not recall warning the boys of the danger of being hit by a boat. Anderson stated that his greater concern was that the boys might drown.

Stevens agreed that Anderson did all of the talking. According to Stevens, Anderson asked the boys how old they were and then suggested that it might be better if they moved closer to shore. Stevens stated that Anderson told the boys it would be safer if they were closer to shore. Stevens did not recall Anderson saying anything about boats. Although Stevens did not speak, he agreed with Anderson's suggestion that the boys move closer to shore because the water was fifty to sixty feet deep in the area where the boys were floating. Stevens stated that while the wardens were talking to the boys, boats passed by on both sides of them.

Both Stevens and Anderson attested that following the conversation, Luther and Prestridge turned and started towards shore, apparently heeding Anderson's suggestion. The game wardens turned their boat and headed to another part of the lake. The boys did not request assistance in returning to shore and the game wardens did not offer any assistance. Both Luther and Prestridge testified that following their conversation with the wardens, they immediately began to make their way back to shore and that the patrol boat turned and headed elsewhere. Luther and Prestridge testified that they did not ask the wardens for assistance in returning to shore and that no help was offered.

As Luther and Prestridge were making their way back to shore, they were run over by a speedboat. Prestridge was only slightly injured but Luther suffered serious injuries to his legs and feet that resulted in the amputation of his left leg above the knee. The game wardens did not observe the accident but they did assist Luther and Prestridge after the boys had made it to the shore with the help of a bystander.

Luther and Prestridge filed suit against TPWD, claiming that the game wardens should have escorted or guided them to shore and that by not doing so, the wardens abandoned the boys to the very peril about which the wardens were concerned. Specifically, Luther and Prestridge alleged that TPWD committed the following acts of negligence which proximately caused the boat accident:

(a) Committing a wrongful act or omission in the operation or use of a motor-driven vehicle or motor-driven equipment (the patrol boat) by abandoning the plaintiffs in a dangerous area instead of guiding or transporting them to a safe swimming area;

(b) Abandoning the plaintiffs in a dangerous area instead of guiding or transporting them to a safe swimming area, while operating or using a motor-driven vehicle or motor-driven equipment (the patrol boat);

(c) Failing to use the motor-driven patrol boat properly to provide protection to plaintiffs; and

(d) Misusing the motor-driven vehicle or motor-driven equipment (the patrol boat) by driving away from and abandoning plaintiffs at a time when plaintiffs were in great danger or peril.

Luther and Prestridge alleged that the foregoing acts of negligence were committed by employees of the State at a time when:

(a) plaintiffs were in the presence of or in view of defendant's employees;

(b) defendant's [sic] knew or had reason to know that that [sic] plaintiffs were in imminent danger and that plaintiffs were about to sustain injury through the act of another or cause injury to themselves by swimming in an area of motorboat traffic; and

(c) the employees of the State were peace officers upon whom a statutory duty had been imposed to prevent injury to plaintiffs.

■ TPWD moved for summary judgment on grounds of sovereign immunity and lack of any duty to escort Luther and Prestridge to shore. The trial court granted summary judgment without stating the specific grounds upon which the summary judgment order was granted. Accordingly, for Luther

and Prestridge to prevail in their appeal of the trial court's order, they must show that both of the independent grounds advanced by TPWD in its summary judgment motion are insufficient to support the order. *Rogers v. Ricane Enters.*, 772 S.W.2d 76, 79 (Tex. 1989); *Hayes v. E.T.S. Enters.*, 809 S.W.2d 652, 655 (Tex.App.—Amarillo 1991, writ denied).

In their first point of error, Luther and Prestridge charge that the trial court's order of summary judgment was erroneous because TPWD waived its sovereign immunity by reason of the Texas Tort Claims Act. *See* Tex.Civ.Prac. & Rem.Code Ann. § 101.001–101.109 (Vernon 1986 & Supp.1993). In their second point of error, Luther and Prestridge contend that the trial court erred in granting summary judgment because TPWD was negligent in breaching a duty owed to them and because that negligence was a proximate cause of the accident in which they were injured. By their third point of error, Luther and Prestridge argue that summary judgment was inappropriate because fact issues existed as to whether TPWD breached its duty to transport or escort them to shore.

██ For reasons which we will express below, we find that TPWD owed no duty to transport, guide or escort Luther and Prestridge to shore. Accordingly, we need not address points of error one and three. Point of error three is entirely dependant on the existence of a duty. Because we have determined that no duty existed, point of error three need not be discussed. Point of error one deals with the question of sovereign immunity and a possible waiver of that immunity by TPWD under the Texas Tort Claims Act. Even if TPWD did waive its immunity, the absence of any duty on the part of TPWD still makes the trial court's order of summary judgment appropriate.[1] Therefore, we will not address point of error one. We turn our attention solely to point of error two.

██ Appellants contend that pursuant to Tex.Crim.Proc.Code Ann. art. 6.06 (Vernon Supp.1993), the game wardens had a duty to transport or escort them to shore. In pertinent part, Section 6.06 states:

> Whenever, in the presence of a peace officer,[2] or within his view, one person is about to commit an offense against the person or property of another, including the person or property of his spouse, or injure himself, it is his duty to prevent it. . . .

Appellants argue that in making their way back to shore they were about to injure themselves and that the game wardens saw this was the case. Accordingly, appellants charge that the wardens owed them a duty to prevent any possible injury by ensuring their safe return to shore. We cannot agree.

The Texas Code of Criminal Procedure sets forth the duties of many government actors including district attorneys,[3] county attorneys,[4] magistrates,[5] peace officers,[6] sheriffs,[7] deputies,[8] and clerks.[9] However, the breach of a duty created by the code does not give rise to civil liability. The purpose of the Texas Code of Criminal Procedure is set forth in article 1.03:

---

1. A defendant may obtain a summary judgment by showing that at least one element of the plaintiff's cause of action has been established conclusively against the plaintiff. *See Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex. 1970).

2. It is unquestioned that Texas Parks and Wildlife Department game wardens are peace officers. Tex.Crim.Proc.Code Ann. art. 2.12(10) (Vernon Supp.1993).

3. Tex.Crim.Proc.Code Ann. art. 2.01 (Vernon Supp.1993).

4. Tex.Crim.Proc.Code Ann. art. 2.02 (Vernon Supp.1993).

5. Tex.Crim.Proc.Code Ann. art. 2.10 (Vernon 1977).

6. Tex.Crim.Proc.Code Ann. art. 2.13 (Vernon 1977); Tex.Crim.Proc.Code Ann. arts. 5.04, 6.05, 6.06 (Vernon Supp.1993).

7. Tex.Crim.Proc.Code Ann. arts. 2.16–2.19 (Vernon 1977).

8. Tex.Crim.Proc.Code Ann. art. 2.20 (Vernon 1977).

9. Tex.Crim.Proc.Code Ann. art. 2.21 (Vernon 1977).

This Code is intended to embrace rules applicable to the prevention and prosecution of offenses against the laws of this State, and to make the rules of procedure in respect to the prevention and punishment of offenses intelligible to the officers who are to act under them, and to all persons whose rights are to be affected by them....

Tex.Crim.Proc.Code Ann. art. 1.03 (Vernon 1977). The object of the Code is not to impose new duties on government actors, the breach of which could give rise to civil liability. Rather, the Code merely attempts to set forth guidelines for peace officers, sheriffs and others to follow in the performance of their everyday responsibilities. Section 6.06 of the Texas Code of Criminal Procedure did not impose a duty on the TPWD game wardens to escort or transport Luther and Prestridge to shore.

Our holding is buttressed by the result in the comparable case of *Elliott v. State,* 818 S.W.2d 71 (Tex.App.—San Antonio 1991, writ denied). In *Elliott,* a law enforcement officer for the Texas Parks and Wildlife Department stopped Charles Elliott's motorboat and asked to see his water safety equipment. Elliott told the officer that his life preserver was in his vehicle on the shore. The officer issued Elliott a citation for his failure to have a life preserver in his boat. The officer then left the scene. A short time later, Elliott fell out of his boat and drowned.

Elliott's wife and children brought wrongful death and survival actions against the State. They specifically alleged that the TPWD officer breached his duty to exercise ordinary care by failing to provide [Elliott] with a flotation devise and by failing to escort [Elliott] safely to shore. The plaintiffs argued that the officer had such a duty pursuant to Sections 31.002 and 31.066(a) of the Water Safety Act. Section 31.002 states:

It is the duty of this state to promote recreational water safety for persons and property in and connected with the use of all recreational water facilities in the state, to promote safety in the operation and equipment of facilities, and to promote uniformity of laws relating to water safety.

Tex.Parks & Wild.Code Ann. § 31.002 (Vernon 1991). Section 31.066(a) declares:

A motorboat must have at least one life preserver, life belt, ring buoy, or other device of the sort prescribed by the regulations of the commandant of the Coast Guard for each person on board, so placed as to be readily accessible.

Tex.Parks & Wild.Code Ann. § 31.066(a). In affirming the trial court's order of summary judgment in favor of the State, the San Antonio Court of Appeals expressed its disagreement with the plaintiffs' contention that these statutes created a duty on the part of the TPWD officer to either escort Elliott to shore or provide him with a life preserver. In a well-reasoned opinion by Justice Butts, the court explained that

[t]he duties imposed in section 31.002 of the Parks and Wildlife Code are general duties to promote water safety. Section 31.066, requiring motorboats to carry life preservers, imposes no duty at all on enforcement officers.

We cannot construe from the general language of section 31.002, a specific duty on the part of enforcement officers to provide life preservers to boaters who do not have them, or, in the alternative, to escort them safely to shore. The officers' duty is to promote water safety by enforcing the laws rather than by assuming the much greater burden of insuring the safety of each individual boater with whom they come in contact. The police are not insurers of the safety of law violators.

The Parks and Wildlife Code also requires that each motorboat carry fire extinguishers (§ 31.067), certain lights (§ 31.064), a whistle or bell (§ 31.065), a flame arrestor or backfire trap (§ 31.068), rearview mirrors (§ 31.071), and other equipment. It must follow, that if [the TPWD officer] should have provided a life preserver to Elliott, that enforcement officers must carry all this required equipment for distribution to violators.

Such a ruling would, of course, be prohibitively expensive to implement and virtually impossible to execute. It would tremendously overburden our law enforcement officers and strain the resources of

the governments that hire and equip them. Officers would spend disproportionate amounts of time escorting all violators to shore, which would necessitate the employment of additional officers, or disproportionate amounts of money in distributing safety equipment to every offender. Balanced against the massive burden such a ruling would place on law enforcement is the negligible likelihood of injury or death occurring immediately following the issuance of a citation for a safety violation.

We conclude that [the TPWD officer] did not owe Elliott a duty to escort him safely to shore or to provide him with a flotation devise.

*Elliott v. State,* 818 S.W.2d at 74 (citations and footnotes omitted).

We concur with the sentiments expressed in *Elliott* and feel confident in our holding that the game wardens had no duty to escort or transport Luther and Prestridge to shore. To entertain Luther and Prestridge's invitation to read into Tex.Crim.Proc.Code Ann. art. 6.06 (Vernon Supp.1993) a requirement that peace officers are obligated to protect persons from their own negligent acts would be a strained interpretation of the statute not in keeping with the intent of the legislature. If peace officers are to be given such responsibilities and duties, we feel such action must be taken by the legislature and not by a judicial interpretation of the statute. Additionally, we observe that unlike the situation in *Elliott,* Luther and Prestridge were not in violation of any law by floating in the lake. Luther and Prestridge were never subject to the control of the wardens. The game wardens could not have issued a citation to Luther and Prestridge for there were no regulations regulating the boys' conduct. Thus, there would be even less justification for imposing a duty on the game wardens in the present case. Point of error two is overruled and the judgment of the trial court is affirmed.