**Veronica AKINS, Individually and as Next Friend of Chance Curtis, a Minor, Appellant**

v.

**Melvin ESTES: Golden Spread Council, Inc., # 562 of the Boy Scouts of America: and Boy Scouts of America, Inc., Appellees.**

No. 07–93–0291–CV.

Court of Appeals of Texas, Amarillo.

Aug. 23, 1994.

Rehearing Overruled Dec. 16, 1994.

36

John Mann, Shamrock, for appellant.

Peterson, Farris, Doores & Jones, Barry D. Peterson, Amarillo, for appellees.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.

POFF, Justice.

This is an appeal from a summary judgment against appellant Veronica Akins individually and as next friend of her son Chance Curtis. Appellant sued (1) Melvin Estes; (2) Golden Spread Council, Inc. # 562 of the Boy Scouts of America (GSC); and (3) Boy Scouts of America, Inc. (BSA). Appellant alleged that Estes, a scoutmaster, sexually abused her son and that the negligence of GSC and BSA was a proximate cause of the abuse and the accompanying harm. GSC and BSA moved for summary judgment and the trial court granted the motion.[1]

On appeal, appellant brings a single point of error in which she contends the trial court erred in granting summary judgment. For the reasons expressed below, we will sustain the point of error, reverse the trial court's order of summary judgment, and remand the cause for trial.

### Facts

In the summer of 1987, Melvin Estes was serving as an assistant scoutmaster in Boy Scout Troop 22. Chance Curtis had just completed the sixth grade. During that summer, Chance was invited by his best friend to a Troop 22 meeting. When Chance arrived at the meeting, he discovered that Estes was associated with the troop. Chance subsequently joined Troop 22.

Although Chance did not know Estes was an assistant scoutmaster with Troop 22 until after he arrived at the troop meeting, Chance was already acquainted with Estes. Estes and Chance lived in the same neighborhood; Chance had become friends with Estes' two sons, particularly with Estes' son William. Chance would sometimes spend the night at William's house and William would sometimes spend the night at Chance's house. Chance's mother (appellant) provided child care to the two Estes boys for a six-month period of time including the summer after Chance and William had completed the fifth grade (1986). It was during this period of close friendship between William and Chance that Estes began to sexually molest Chance.

Estes and his wife were having marital difficulties and were not living together. Consequently, when Chance would spend the night at the Estes home, Mrs. Estes would not be present. The molestation first occurred when Chance was spending the night at William's home. The record shows that Chance was molested on four separate occasions that summer by Estes. We need not recite the details of the molestations other

---

1. In the course of granting the summary judgment, the trial court severed appellant's action against Melvin Estes.

than to say that the incidents were serious and criminal. Chance stopped associating with William shortly after that summer and Chance's mother stopped babysitting the Estes boys. Chance had no further contact with Estes until the next summer (1987) when he first attended a meeting of Troop 22.

Charles Hearn was the scoutmaster of Troop 22. Shortly after joining Troop 22, Chance told Hearn's son Ricky and other fellow scouts the details of his molestation by Estes. Some of the other scouts (but apparently not Ricky Hearn) confided in Chance that Estes had "tried the same thing with them." Chance did not tell Charles Hearn that Estes had molested him. But Charles Hearn did learn that something was amiss with Estes.

During that same summer of 1987, Charles Hearn and his son Ricky went to Kevin Herbert, a GSC employee and related their concerns regarding Estes. Herbert testified by deposition concerning his conversation with the Hearns but he was not very specific concerning the details of the conversation. The essence of Herbert's testimony is that the Hearns told him "they had heard there was some kind of situation between [Estes] and ... some of the boys." When asked if sexual molestation had been mentioned, Herbert responded that "as far as sexual molestation, that wasn't specifically made clear to me."

Herbert testified that he made a half-page, handwritten report of his conversation with the Hearns and forwarded it to Myron Rosebrook, the Scout Executive for GSC. Herbert stated that he made the report in compliance with the procedure set forth in a scout policy notebook dealing with sexual, physical and mental abuse. Herbert said that upon giving his report to Rosebrook, the matter was Rosebrook's concern.

Within two to three months after the Hearns spoke to Herbert, a district[2] scout commission recommended Estes as a potential scoutmaster for a new troop that a church wished to sponsor. Herbert testified that he did not make the district commission

aware of what he knew about Estes because at least some of the members of the commission already knew of the allegations. The new troop, Troop 223, came into existence shortly thereafter and the troop committee selected Estes to be the scoutmaster.

Like Herbert, Rosebrook sounded no alarms concerning Estes when the sponsoring church considered making Estes its scoutmaster. According to Rosebrook's deposition testimony, Herbert reported to him that Ricky Hearn "had heard a boy say that Mr. Estes was messing with some boys." Rosebrook, a 26–year employee of various local Boy Scout councils, originally stated in his deposition that he had no idea what the term "messing with some boys" meant. However, later in his deposition, Rosebrook admitted that he was concerned when he heard that some boys were being "messed with" and he admitted that the term could include inappropriate activity such as sexual molestation. Rosebrook conceded that he knew the report of Estes "messing with some boys" needed to be investigated.

Rosebrook testified that it was shortly after the negative report on Estes that a local church decided it wanted Estes to be its scoutmaster. Rosebrook stated that it was the responsibility of Mr. Herbert and the local district to put the church in contact with a potential scoutmaster. Rosebrook said that "[t]he local chartered organization [the local church], after being introduced to Mr. Estes, decided they wanted him as a Scout master." Rosebrook maintained that he himself had nothing to do with introducing Estes to the local chartered organization as a prospective scoutmaster. Rosebrook testified that he voiced no objection and never thought about voicing any objection to the decision to introduce Estes to the local church as a prospective scoutmaster. The only person to make Rosebrook aware of any suspicions surrounding Estes had been Herbert. Rosebrook made no reports concerning Estes to anyone else in the Boy Scouts until a much later time when Estes was

2. A district is a subdivision of a council such as     the Golden Spread Council (GSC).

arrested.[3]

Rosebrook testified that he thought Estes' possible misconduct was a serious matter. Upon receiving Herbert's report, he directed Herbert to talk to the Hearns again and to "sit down and write down everything he [Herbert] [could] about it, and find out who the boys might have been, so that it could be investigated." Rosebrook stated that Herbert talked to the Hearns again and Herbert found there had been an ongoing feud between the Hearn family and the Estes family. Ricky Hearn could not or would not provide any information as to the boys involved. According to Rosebrook, Ricky Hearn told Herbert that the charges against Estes came from "a Scout who was a known liar." Based upon the Hearns' conversation with Herbert, Rosebrook determined that the allegations concerning Estes were "just another step in their [Estes' and Hearn's] fight." Rosebrook considered the charges concerning Estes to be completely discredited.

Rosebrook did not discuss the matter with local police or others because he considered the matter to be based on an unfounded rumor that could not be substantiated. Rosebrook did not discuss the matter with Chance's parents because Chance's name had not been mentioned in connection with the report on Estes. According to Rosebrook and Herbert, the Hearns never mentioned any particular victim by name.

After being made scoutmaster of Troop 223, Estes encouraged Chance to join the new troop and Chance did so. While Estes did not molest Chance during the brief period of time Chance was a member of Troop 22, Estes resumed his advances on Chance after Chance joined Troop 223. Chance testified by deposition that

> [a]fter [Estes] got his troop, and it was about physical [examination] time for us to go to summer camp, and he started talking about what they were going to do and everything, and then he pulled me off by myself and he started telling me all of this stuff that they're going to be doing [during the physical examination].

Chance testified that Estes told him the persons performing the physical examinations "were going to take their pinky, and he started telling—and then he told me, This is what they're going to do with it." This conversation took place in the bathroom of the church building where the troop meetings were held. Estes then tried to fondle Chance whereupon Chance left the bathroom.

Chance also testified that after he joined Troop 223, Estes invited him to his (Estes') house to discuss Boy Scout summer camp. When Chance arrived at Estes' house, Estes "started with the stuff again." Specifically, Estes "started trying to break in with his massages and trying to get down [Chance's] pants again." Chance testified that Estes

> invited me back into his bedroom to look at [pornographic] magazines, and I went back there to look at these magazines, and he started giving me a massage again and started trying to take off my pants and feeling all over me, and I just got up and left.

### The Petition

Appellant made her allegations of common law negligence against GSC and BSA in paragraphs VIII, IX and X of her petition which we set forth below:

### VIII.

Plaintiff would show that on numerous occasions, prior to and during the incident in question, she entrusted Defendants GOLDEN SPREAD COUNCIL and BOY SCOUTS OF AMERICA, INC. with the care, custody and development of the minor, CHANCE CURTIS. In this connection, Plaintiff would show that during these periods of entrustment, Defendant ESTES was a Scout Master for Defendants GOLDEN SPREAD COUNCIL and BOY SCOUTS OF AMERICA, INC. and as such, the agent of both of these Defendants.

---

3.  Estes was arrested in January of 1989. He was subsequently imprisoned.

## IX.

Pursuant to the above-described relationship, Defendants BOY SCOUTS OF AMERICA, INC. and GOLDEN SPREAD COUNCIL owed a duty to the minor, CHANCE CURTIS, to use reasonable care for the safety, guidance, teaching, nurturing and moral development of the minor during the time he was entrusted to their care. In conjunction with this, these Defendants owed a duty to the minor Plaintiff to reasonably and properly screen, select, train, supervise and retain BOY SCOUTS OF AMERICA, INC. and GOLDEN SPREAD COUNCIL Scout Masters such as Defendant ESTES.

## X.

Defendants GOLDEN SPREAD COUNCIL and BOY SCOUTS OF AMERICA, INC. were negligent and breached these duties to CHANCE CURTIS by allowing him to be sexually abused by Defendant ESTES during the time the minor Plaintiff was in the care of Defendants GOLDEN SPREAD COUNCIL and BOY SCOUTS OF AMERICA, INC. Plaintiff would further show that these Defendants were negligent and breached these duties by failing to use reasonable care and engaging in a course of conduct which fell below the standard of reasonable care in:

A. Failing to screen Scout Masters such as Defendant ESTES;

B. Failing to properly train and supervise Scout Masters such as Defendant ESTES;

C. Failing to act and remove Scout Masters such as the Defendant ESTES when they perform their duties negligently and improperly;

D. Failing to educate the children in their care, custody and control in the prevention of sexual abuse by Scout Masters;

E. Failing to educate the parents in the prevention of child sexual abuse;

F. Failing to warn parents of scouts and scouts of numerous prior sexual abuse incidents known to the Defendants;

G. Failing to take adequate measures to stop the sexual abuse of the minor, CHANCE CURTIS when Defendants knew or should have known of the sexual abuse;

H. Failing to notify the parents of the minor, CHANCE CURTIS, so that he could receive proper medical attention despite the fact that he was in Defendants' care.

As a proximate result of the conduct of Defendants GOLDEN SPREAD COUNCIL and BOY SCOUTS OF AMERICA, the minor, CHANCE CURTIS, was sexually abused and suffered serious grievous physical and mental injuries.

### The Motion for Summary Judgment

A defendant who moves for summary judgment must show that no material issue of fact exists as to the plaintiff's cause of action. *Griffin v. Rowden,* 654 S.W.2d 435, 435–36 (Tex.1983). This can be done by showing that at least one element of the plaintiff's cause of action has been conclusively established against the plaintiff. *Luther v. Texas Parks & Wildlife Dep't,* 863 S.W.2d 788, 791 n. 1 (Tex.App.—Amarillo 1993, n.w.h.); *see also Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). In this case, appellees moved for summary judgment on the grounds that the evidence established the absence of not just one, but three elements of appellant's negligence cause of action. First, appellees alleged Estes was not their agent and therefore they owed no duty to Chance under an agency theory. Second, appellees alleged that neither of them breached a duty owed to Chance. Third, appellees alleged that even if they did breach a duty owed to Chance, such breach was not a proximate cause of any injury incurred by Chance because "the sexual misconduct between defendant Estes and Chance Curtis took place in defendant Estes' residence before Curtis became a member of Boy Scouts."

The trial court granted summary judgment without stating a specific reason therefore. Consequently, the summary judgment must be affirmed if any of the theories advanced in

the motion are meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989). We will examine the merits of each of appellees' three theories for summary judgment.

### First Ground for Summary Judgment— No Agency Relationship

In contending that summary judgment is proper because Estes was not their agent, appellees necessarily argue that appellant's petition alleges appellees' duty arises solely out of an agency relationship. We do not interpret appellant's petition in that way. Upon examination of paragraphs VIII and IX of appellant's petition, we find that a duty is alleged to arise even in the absence of an agency relationship between Estes and appellees. Specifically, we find appellant to have alleged that GSC and BSA had a duty "to reasonably and properly screen, select, train, supervise and retain" scoutmasters. Thus, appellant has alleged that GSC and BSA are directly negligent, not just vicariously negligent for Estes' actions.

Because we find appellant to have alleged the existence of a duty even in the absence of a principal/agent relationship, summary judgment cannot be properly based on the ground that there is no agency relationship between Estes and appellees. Agency, of course, is not an element of a direct negligence cause of action. Even if it were to be established as a matter of law that there is no agency relationship, such fact would not mean appellees have no duty to Chance.

### Second Ground for Summary Judgment— No Duty or Breach of Duty

We move on now to a discussion of appellees' second basis for summary judgment— that they did not breach any duty owed to Chance. On appeal, appellees assert both that they owed Chance no duty and that they breached no duty. Thus, our discussion here concerns whether appellees owed Chance a duty as well as whether appellees breached any duty they may have had to Chance.

To sustain a cause of action for negligence, a plaintiff must produce evidence of a duty, a breach of that duty, proximate cause and damage. *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex.1984); *Parker v. Miller*, 860 S.W.2d 452, 454 (Tex.App.—Houston [1st Dist.] 1993, n.w.h.). The threshold inquiry in a negligence case is duty. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). If no legal duty exists, no legal liability can arise on account of negligence. *Hanselka v. Lummus Crest, Inc.*, 800 S.W.2d 665, 667 (Tex. App.—Corpus Christi 1990, no writ). The existence of a duty is a question of law for the court. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d at 525; *Gray v. Baker & Taylor Drilling Co.*, 602 S.W.2d 64, 65 (Tex. Civ.App.—Amarillo 1980, writ ref'd n.r.e.).

"A duty of care arises when conditions are such that a 'prudent person would have anticipated and guarded against the occurrence which caused' another's injury." *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 590 (Tex.1986) (quoting *St. Louis Southwestern Ry. Co. of Texas v. Pope*, 98 Tex. 535, 541, 86 S.W. 5, 7 (1905)). Thus, in this case, the duty GSC and BSA owed Chance was the duty to act as a reasonable, prudent person would act under the same or similar circumstances regarding any reasonably foreseeable risk. *Colvin v. Red Steel*, 682 S.W.2d at 245. In determining whether a duty is owed, the foreseeability of the risk is the dominant consideration. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d at 525.

As mentioned earlier, appellant alleged that GSC and BSA had a duty to reasonably and properly screen, select, train, supervise and retain scoutmasters. Appellant alleges that appellees breached this duty by, *inter alia*, failing to screen scoutmasters such as Estes, failing to remove scoutmasters such as Estes, failing to warn scouts and parents of scouts of numerous prior sexual abuse incidents known to appellees, and failing to take adequate measures to stop the sexual abuse of Chance. The gravamen of appellant's complaint is that GSC and BSA were negligent in failing to investigate reports of inappropriate sexual behavior on the part of Estes and in failing to take steps to remove Estes from his position as a troop leader.

Appellant's petition states a cause of action against GSC and BSA for negligent hiring.

As recognized in *Estate of Arrington v. Fields*, 578 S.W.2d 173, 178 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.),

> [t]he basis of responsibility under the doctrine of negligent hiring is the master's own negligence in hiring or retaining in his employ an incompetent servant whom the master knows or by the exercise of reasonable care should have known was incompetent or unfit and thereby creating an unreasonable risk of harm to others.

The courts of Texas have long recognized that a master has a duty to inquire as to the competence and qualifications of those he considers for employment. *Id.* This duty is owed by the master to his other servants and to the public. *Id.*

A claim of negligent hiring is based on the defendant's direct negligence rather than the defendant's vicarious liability for the torts of its workers. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d 942, 950 (Tex.App.—Amarillo 1994, writ granted). Negligent hiring addresses a different wrong from that sought to be addressed by the doctrine of *respondeat superior*. The tort of negligent hiring addresses the risk created by exposing members of the public to a potentially dangerous individual, while the doctrine of *respondeat superior* is based on the theory that the employee is the agent of the employer.

Liability for negligent hiring does not depend upon a finding that the employee was acting within the course and scope of his employment when the employee's tortious act occurred. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d at 950; *Dieter v. Baker Service Tools*, 739 S.W.2d 405, 408 (Tex.App.—Corpus Christi 1987, writ denied). The scope of employment limitation on liability which is part of the *respondeat superior* doctrine is not a part of the tort of negligent hiring. If course and scope of employment was a required element of a negligent hiring claim, negligent hiring as a unique cause of action would be rendered superfluous by the *respondeat superior* doctrine. *Dieter v. Baker Service Tools*, 739 S.W.2d at 408.

As a general rule, a person has no duty to protect another from the conduct of a third person. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d at 525. However, the tort of negligent hiring is an exception to the general rule. *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d at 949–51; *Dieter v. Baker Service Tools*, 739 S.W.2d at 408; *Estate of Arrington v. Fields*, 578 S.W.2d at 177–79. An employer who negligently hires or retains in his employ an individual who is incompetent or unfit for the job may be liable to a third party whose injury was proximately caused by the employer's negligence.

A question arises concerning the applicability of the negligent hiring doctrine in this case because it is undisputed that Estes was not an employee of GSC or BSA. Rather, Estes was a volunteer. In *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d at 949, we found that a master-servant relationship existed between a Boys Club volunteer and the Boys Club. Consequently, we concluded that the Boys Club was under a duty to exercise reasonable care in the selection of its volunteers. *Id.* at 951. The breach of that duty would constitute negligence on the part of the Boys Club under the theory of negligent hiring. *Id.* at 949–51. We stated that "[w]hether a master-servant relationship exists will not be determined simply by the payment or non-payment of wages." *Id.* at 949. Here, the fact that Estes was not a paid employee does not foreclose appellant's cause of action for negligent hiring.

We find the negligent hiring doctrine to be applicable in the present case despite the fact BSA and GSC exercise no direct control over the daily activities of local scout troops and their adult leaders. As stated by the Supreme Court of New Jersey, "[o]ne dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee." *Di Cosala v. Kay*, 91 N.J. 159, 450 A.2d 508, 515 (1982). Certainly, the Boy Scouts, as "a party dealing with the public," should be required to use reasonable care in the selection and retention of its scoutmasters. In fact, organizations such as

the Boy Scouts, whose primary function is the care and education of children, owe a higher duty to their patrons to exercise care in the selection of their workers than would other organizations. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d at 951. A higher standard of care is owed to children than to similarly situated adults. *Id.* at 951.

▮ Although GSC and BSA did not have direct and immediate supervision over Estes, they did have an affirmative obligation to relieve Estes from his duties with the Boy Scouts if they knew or had reason to know he was unfit. *See Schultz v. Boy Scouts of America, Inc.*, 102 A.D.2d 100, 476 N.Y.S.2d 309, 316 (1984) (Murphy, P.J., dissenting). We agree with appellant's assertion that GSC and BSA had a duty to reasonably and properly screen and retain scoutmasters. Having found that GSC and BSA owed Chance a duty, we will now proceed to a discussion of appellees' contention that they did not breach any duty owed to Chance. In analyzing the breach of duty issue, we will consider GSC and BSA separately.

▮ GSC contends that it did not breach any duty to relieve Estes from his duties with the Boy Scouts because it had no right to exercise control over the selection or approval of Estes as a troop leader. GSC argues that the selection of adult troop leaders is under the exclusive control of the chartered organization that sponsors the troop. In support of its argument, GSC cites Article VIII, § 3, Clause 11 of the Rules and Regulations of the Boy Scouts of America as support. That clause states:

Unit Leadership. All recommendations for commissions to serve as unit leaders shall originate with the unit committee with concurrence from the chartered organization.

All recommendations for commissions to serve as assistant unit leader ... shall originate with the unit leader with concurrence of the unit committee.

However, other provisions of the Rules and Regulations of the Boy Scouts of America belie GSC's claim that it had no right to exercise control over the selection and retention of Estes as a troop leader. Article VI, § 4, Clause 4 states that "Local Councils shall provide means for assisting chartered organizations in securing and training individuals to serve as unit leaders and assistants." Article IV of the Standard Articles of Incorporation for a Local Council states that local councils are to "specifically restrict[ ] the leadership to those persons who are willing to subscribe to the declarations of principles" set forth in the "Bylaws and the Rules and Regulations of the Boy Scouts of America." The Bylaws for a local council state that the council "shall provide means for assisting chartered organizations in securing and training qualified persons to serve as unit leaders and assistants."

The summary judgment evidence shows that GSC recommended Estes as a scoutmaster to the church that desired to sponsor a new scout troop. This was done in spite of the fact that just two or three months earlier, GSC received a report that Estes was "messing with some boys." This evidence raises a fact issue regarding GSC's claim that it had no right to exercise control over the selection and retention of Estes as a troop leader.

GSC argues that even if it did have the power to remove unfit volunteers from troop leadership positions, the summary judgment evidence conclusively shows that it had no knowledge Estes was in any way unfit. GSC contends that appellant "did not provide any summary judgment evidence to establish an issue of fact as to whether [GSC] ... had any knowledge prior to January of 1989 [when Estes was arrested] that Estes had allegedly sexually molested anyone." We disagree.

An employee of GSC, Herbert, as well as GSC's Scout Executive, Rosebrook, had both been told that Estes was "messing with some boys." Contrary to GSC's assertions, both men interpreted the report as possibly alleging acts of sexual abuse. We can confidently say that in light of the accusations regarding Estes, GSC did not act as a reasonable, prudent person would act when it suggested Estes as a new scoutmaster. It is beyond peradventure that the recommendation of a man as a scoutmaster who allegedly had been messing with boys, created an unreasonable risk of harm to the young scouts

GSC served. Based on the information it received concerning Estes, GSC either knew or should have known Estes had pedophilic tendencies that could result in the victimization of young boy scouts. We find there is a fact question as to whether GSC breached its duty to relieve Estes from his duties with the Boy Scouts.

We will now visit the breach of duty issue in regard to BSA. Like GSC, BSA contends that it had no right to relieve Estes from his duties with the Boy Scouts. This contention is weakened, however, by BSA's own charter and bylaws. Article VIII, § 1 of the Charter and Bylaws of the Boy Scouts of America declares:

> No person shall be approved as a leader unless, in the judgment of the Corporation [the Boy Scouts of America], that person possesses the moral, educational, and emotional qualities deemed necessary for leadership and satisfies such other leadership qualifications as it may from time to time require.

The summary judgment evidence revealed that BSA maintains a confidential list of persons previously reported to BSA as being ineligible to serve as troop leaders. It is certainly a logical inference from the facts in evidence that BSA would not keep such a list if it had no power or authority to see that unfit individuals are precluded from working as Boy Scout volunteers. There is clearly a fact issue as to whether BSA had the right to exercise some control over the selection and retention of scoutmasters and their assistants.

The record is clear that BSA did not know of any problems with Estes until his arrest in 1989. GSC never forwarded any information to BSA regarding the reports it had received concerning Estes. Thus, BSA cannot be directly negligent in failing to remove Estes from his volunteer positions with the Boy Scouts. However, BSA can be vicariously negligent under the doctrine of *respondeat superior* for the direct acts of negligence of GSC. The local councils essentially serve as servants of BSA so far as investigations of a troop leader's possible unfitness are concerned. Consequently, if GSC is found to be directly negligent in retaining Estes as a scoutmaster, BSA would be vicariously negligent. Because a fact issue exists as to GSC's direct negligence, a fact issue also exists in regard to BSA's vicarious negligence. Appellees' second ground for summary judgment is not a proper basis for an order of summary judgment.

### *Third Ground for Summary Judgment— No Proximate Cause*

Appellees' third ground for summary judgment is that any breach of duty was not a proximate cause of any harm incurred by Chance because Estes only sexually abused Chance prior to the time Chance became a Boy Scout. The summary judgment evidence raises a definite fact issue as to whether this is the case. As detailed earlier in this opinion, Chance testified by deposition that on two occasions subsequent to the time he joined Troop 223, Estes attempted to fondle him. It simply cannot be maintained that the evidence conclusively shows Chance was sexually abused by Estes only at a time before he became a Boy Scout. The third ground advanced by appellees in support of the summary judgment does not support the order.

### *Summary*

Having determined that none of the three grounds advanced by appellant as a basis for summary judgment will support the trial court's order of summary judgment, we sustain appellant's solitary point of error. The trial court erred in granting summary judgment. The order of summary judgment is reversed and the cause is remanded to the trial court for trial.

REYNOLDS, Chief Justice, concurring.

A thread running throughout the fabric of the summary judgment evidence highlighted in the majority opinion is that the Boy Scouts of America, Inc. and its chartered councils, one of which was the Golden Spread Council, Inc., assumed the obligation of assisting chartered organizations "in securing and training qualified persons to serve as unit leaders and assistants," and to identify and report those persons who are "unfit" to serve

in those capacities. Accepting, as we must, the evidence and reasonable inferences in favor of Veronica Akins, and resolving any doubts in her favor, *El Chico Corp. v. Poole*, 732 S.W.2d 306, 315 (Tex.1987), we cannot find from the present record that BSA and GSC met and defeated Akins' pleaded cause of action. BSA and GSC did not establish as a matter of law that they owed her no duty, or that they did not breach a duty, or, if they did, that the breach was not a proximate cause of her pleaded damages. Instead, the record merely depicts the classic situation where there is doubt as to the ultimate facts, which precludes summary judgment. *In re Price's Estate*, 375 S.W.2d 900, 904 (Tex. 1964).

Consequently, I concur in the judgment of reversal and remand.